1

2

3

4                        IN THE UNITED STATES DISTRICT COURT

5                      FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7                                                No. C 11-1819 PJH

8    DENISE R. CRUZ DAVIS,
                                                 **ORDER RE PLAINTIFF'S MOTION FOR**
9                    Plaintiff,                  **SUMMARY JUDGMENT AND**
                                                 **DEFENDANT'S CROSS-MOTION FOR**
10         v.                                    **SUMMARY JUDGMENT**

11   MICHAEL J. ASTRUE, Commissioner of
     Social Security,
12
                     Defendant.
13   _____/

14         Plaintiff Denise R. Cruz Davis ("Davis") seeks judicial review of the Commissioner of

15   Social Security's ("Commissioner") decision denying her claim for supplemental security

16   income.  This action is before the court on the parties' cross-motions for summary

17   judgment, and Davis' alternative motion to remand.  Having read the parties' papers,

18   administrative record and relevant legal authority, the court REMANDS this case to the ALJ

19   for further proceedings consistent with the court's order.

20                                **BACKGROUND**

21         Davis, who was forty-four years-old when she filed for disability, has a high school

22   education and previously worked as a caregiver, kennel cleaner, cashier, packager, and

23   housekeeper.  She alleges disability since December 1, 2006, on the basis of spine, back,

24   shoulder, stomach, head and hand problems, loss of energy, loss of mobility, and other

25   body pain.  She claims these conditions, in addition to her specific impairments including

26   obesity, pseudo-tumor, arthritis, fibromyalgia, gastroesophageal reflux disease,

27   spondylolisthesis, headaches, and other alleged medical conditions render her disabled.

28         On December 20, 2007, Davis applied for supplemental security income ("SSI").

United States District Court
For the Northern District of California

1
2
3
4

The Commissioner denied Davis' application both initially and upon reconsideration.  Davis subsequently requested a hearing before an administrative law judge ("ALJ"), which took place on April 23, 2010.  On June 16, 2010, the ALJ issued a decision finding Davis not disabled under the Social Security Act.

5
6
7
8
9
10
11
12
13
14

Davis subsequently appealed to the Appeals Council, which, on March 14, 2011, denied her request to review the ALJ's decision.  However, because it appeared that the Appeals Council may have had an incomplete record before it, on March 16, 2011, the Appeals Council notified Davis that it was allowing her to submit additional information and/or evidence, within twenty-five days of that notice.  Davis failed to do so.  In a subsequent May 6, 2011 notice, the Appeals Council notified Davis that it had previously set aside its March 14, 2011 decision to consider additional information and/or arguments, but that because Davis failed to submit any, it again found no reason to review the ALJ's decision and was denying review.  Thus, the ALJ's June 16, 2010 decision became the Commissioner's final decision.

15
16
17

Apparently, in lieu of submitting additional evidence to the Appeals Council per its March 16, 2011 notice, on April 14, 2011, prior to the Appeals Council's final May 6, 2011 decision, Davis instead filed the instant appeal before this court.

**LEGAL STANDARDS**

18
19

**A.    Sequential Analysis**

20
21
22
23
24
25
26

The Social Security Act ("the Act") provides for the payment of disability insurance benefits to people who have contributed to the Social Security system and who suffer from a physical or mental disability.  See 42 U.S.C. § 423(a)(1).  To evaluate whether a claimant is disabled within the meaning of the Act, the ALJ is required to use a five-step analysis.  20 C.F.R. § 404.1520.  The ALJ may terminate the analysis at any stage where a decision can be made that a claimant is or is not disabled.  See Pitzer v. Sullivan, 908 F.2d 502, 504 (9th Cir. 1990).

27
28

At step one, the ALJ determines whether the claimant is engaged in any "substantial gainful activity," which would automatically preclude the claimant from receiving disability

**United States District Court**
For the Northern District of California

1  benefits.  See 20 C.F.R. § 404.1520(a)(4)(i).  If not, at the second step, the ALJ must

2  consider whether the claimant suffers from a severe impairment which "significantly limits

3  [the claimant's] physical or mental ability to do basic work activities."  See 20 C.F.R. §

4  404.1520(a)(4)(ii).  At the third step, the ALJ compares the claimant's impairment to a

5  listing of impairments in the regulations.  If the claimant's impairment or combination of

6  impairments meets or equals the severity of any medical condition contained in the listing,

7  the claimant is presumed disabled and is awarded benefits.  See 20 C.F.R.

8  § 404.1520(a)(4)(iii).

9      If the claimant's condition does not meet or equal a listing, the ALJ must proceed to

10  the fourth step to consider whether the claimant has sufficient "residual functional capacity"

11  ("RFC") to perform her past work despite the limitations caused by the impairment.  See 20

12  C.F.R. § 404.1520(a)(iv).  If the claimant cannot perform her past work, the Commissioner

13  must show, at step five, that the claimant can perform other work that exists in significant

14  numbers in the national economy, taking into consideration the claimant's "residual

15  functional capacity, age, education, and past work experience."  See 20 C.F.R.

16  § 404.1520(a)(4)(v).

17      Overall, in steps one through four, the claimant has the burden to demonstrate a

18  severe impairment and an inability to engage in her previous occupation.  Andrews v.

19  Shalala, 53 F.3d 1035, 1040 (9th Cir. 1995).  If the analysis proceeds to step five, the

20  burden shifts to the Commissioner to demonstrate that the claimant can perform other

21  work.  Id.

22      Should the ALJ issue an unfavorable decision for the claimant, the claimant may

23  request review of the decision with the Appeals Council.  20 C.F.R. § 404.967.  The

24  Appeals Council "may deny or dismiss the request for review, or it may grant the request

25  and either issue a decision or remand the case to an administrative law judge."  Id.  The

26  claimant may submit documents or other evidence with the request for review, which the

27  claimant would like the Appeals Council to consider.  20 C.F.R. § 404.968.  Moreover, the

28  Appeals Council is required to evaluate the entire record and "[i]f new and material

evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b).

**B.      Standard of Review**

This court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g).  The ALJ's decision must be affirmed if the ALJ's findings are "supported by substantial evidence and if the [ALJ] applied the correct legal standards." Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001) (citation omitted).  "Substantial evidence" means more than a scintilla, but less than a preponderance, or evidence which a reasonable person might accept as adequate to support a conclusion.  Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).  The court is required to review the administrative record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion.  McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989).  Where the evidence is susceptible to more than one rational interpretation, the court must uphold the ALJ's decision.  Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989).

Additionally, the harmless error rule applies where substantial evidence otherwise supports the ALJ's decision.  Curry v. Sullivan, 925 F.2d 1127, 1129 (9th Cir. 1991) (citing Booz v. Sec'y of Health and Human Servs., 734 F.2d 1378, 1380-81 (9th Cir. 1984)).

A decision by the Appeals Council to deny review of the ALJ's decision "is a non-final agency action not subject to judicial review because the ALJ's decision becomes the final decision of the Commissioner." Taylor v. Comm'r of Soc. Sec. Admin., 659 F.3d 1228, 1231 (9th Cir. 2011).  However, "when the Appeals Council considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence." Brewes v. Comm'r of Soc. Sec. Admin., 2012 WL 2149465 at *4 (9th Cir. 2012); see also Harman v. Apfel, 211 F.3d 1172, 1180 (9th Cir. 2000).

////

United States District Court
For the Northern District of California

**United States District Court**

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### ALJ'S FINDINGS

On June 16, 2010, the ALJ found Davis not disabled, concluding that she could still perform jobs within the national economy.  At step one, the ALJ determined Davis had not engaged in "substantial gainful activity" since her onset date.  At step two, the ALJ found Davis had four severe impairments, including obesity, pseudo-tumor, arthritis, and fibromyalgia.  In addition, the ALJ found that Davis had other non-severe impairments including gastroesophageal reflux disease, grade I spondylolisthesis of L3 on L4 and headaches.[1]

At step three, the ALJ concluded that Davis did not have an impairment or combination of impairments that met the criteria of any section of the listing of impairments. The ALJ then decided Davis possessed an RFC to perform at least sedentary work.  At step four, the ALJ found that Davis could not perform her past relevant work, and the ALJ proceeded to step five.  Based on Davis' age, education, work experience, RFC, and application of Medical-Vocational Guidelines (also known as the "Grids"), the ALJ determined Davis could perform jobs within the national economy, and therefore found Davis not disabled.

### APPEALS COUNCIL ACTION

Davis appealed the ALJ's decision to the Appeals Council, which denied her request for review on March 14, 2011.  In support of her appeal, Davis submitted new documents to the Appeals Council that were not previously before the ALJ, which the Appeals Council considered.  The new evidence included a post-decision fibromyalgia RFC questionnaire dated July 15, 2010, from Dr. Sookra, and post-hearing mental health records from Licensed Clinical Social Worker ("LCSW") Kevin Gutfeld.  The new evidence is described

---

[1]Pseudo-tumor is a "disorder most commonly seen in obese young women, characterized clinically by headache, blurred vision, and visual obscurations resulting from increased intracranial hypertension."  Stedman's Medical Dictionary, 1593 (28th ed. 2006). Fibromyalgia is "[a] common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances; the cause is unknown. "  Id. at 725. Spondylolisthesis is "[f]orward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or on the sacrum."  Id. at 1813.

below.

### i.    Dr. Sookra's Post-Hearing Fibromyalgia RFC Questionnaire

Dr. Sookra, one of Davis' treating physicians, submitted a post-ALJ hearing fibromyalgia RFC questionnaire related to many of Davis' impairments, conditions and symptoms including her pain.  Most notably, Dr. Sookra indicated Davis suffered from fibromyalgia, carpal tunnel syndrome and pseudo-tumor.  Likewise, Dr. Sookra gave a prognosis that Davis had gastroesophageal reflux disease, hyperlipidemia, sciatica, osteoarthritis, and headaches.  Furthermore, Dr. Sookra noted that clinical findings indicated Davis had grade I spondylolisthesis of L3 on L4, mild degenerative disc disease and severe to moderate facet arthropathy.

The questionnaire also detailed Davis' pain.  Dr. Sookra indicated Davis experienced pain in six different bilateral locations on her body and that she experienced "pain on a daily basis."  A.T. 420.  In relation, Dr. Sookra noted Davis "frequently" experienced pain or other symptoms, which was "severe enough to interfere with [the] attention and concentration needed to perform even simple work tasks[.]"  A.T. 420.  Additionally, Dr. Sookra noted that Davis was capable of low stress jobs in terms of tolerable work stress.

As for Davis' functional limitations, Dr. Sookra indicated Davis could sit for one hour before needing to get up and stand for 30 minutes before needing to sit or walk around. Dr. Sookra also found that Davis could "rarely" lift 10 pounds in a competitive work setting. A.T. 422.  The questionnaire also indicated Davis could "occasionally" twist, stoop, crouch, climb ladders, and climb stairs.  A.T. 422.  Finally, Dr. Sookra found that Davis had limitations related to doing repetitive reaching, handling or fingering.

### ii.    LCSW Kevin Gutfeld's Mental Health Progress Notes

Davis also submitted mental health progress notes from LCSW Gutfeld, which were considered by the Appeals Council.

In the progress notes dated September 3, 2010, LCSW Gutfeld gave a clinical assessment that Davis had depression and an anxiety disorder.  Moreover, LCSW Gutfeld

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1    gave Davis a GAF score of 55.[2]

2         LCSW Gutfeld's progress notes from September 23, 2010, mentioned that Dr.

3    Sookra wanted to start Davis on Cymbalta for her pain, anxiety and depression.  In general,

4    other findings were "unremarkable" or "appropriate," though LCSW Gutfeld listed Davis'

5    mood as anxious.  A.T. 407.

6         Finally, in the progress notes dated January 6, 2011, LCSW Gutfeld noted that Davis

7    talked about her pain and depression.  In addition, LCSW Gutfeld gave a clinical

8    assessment of depression and an anxiety disorder, but he noted Davis had a GAF score of

9    60, which represented an improvement from the prior notes.

10        **iii.    Appeals Council's Decisions**

11        In its March 14, 2011 decision denying Davis' request to review the ALJ's decision,

12   the Appeals Council indicated that it considered Davis' objections to the ALJ's decision and

13   the additional evidence Davis provided.  The Appeals Council noted that Davis objected to

14   the ALJ's evaluation of Nurse Meyer's opinion, a third-party function report, and Davis'

15   insurance status.

16        As for Davis' objections to the ALJ decision, the Appeals Council explained that the

17   ALJ found Nurse Meyer's opinion to be "inconsistent with the record[,] . . . based on

18   subjective complaints, and it lack[ed] support from diagnostic studies or objective findings

19   on examination."  A.T. 12.  Likewise, the Appeals Council reiterated that the ALJ found the

20   third-party function report to be repetitive, and that Davis' insurance status did not qualify

21   her for benefits.

22        Regarding the post-decision evidence Davis submitted, the Appeals Council

23

24   ───────────────

25   [2]A GAF score of 51-60 indicates "[m]oderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)."  American

26   Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (4th ed. Text Revision 2000) (DSM-IV-TR), 34.  Note, however, "[t]he Commissioner has determined the GAF scale

27   'does not have a direct correlation to the severity requirements in [the Social Security Administration's] mental disorders listings.'"  McFarland v. Astrue, 288 Fed. Appx. 357, 359

28   (9th Cir. 2008) (quoting Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed.Reg. 50,746, 50,765 (Aug. 21, 2000)).

1    characterized Dr. Sookra's questionnaire as "an incomplete residual functional capacity by

2    a non-treating physician," and LCSW Gutfeld's notes as an "initial intake with one treatment

3    session for depression."  A.T. 12.  It further determined that Dr. Sookra's report was

4    "duplicative of Nurse Meyer's opinion and would not support a change in the determined

5    residual functional capacity."  A.T. 12.  As for LCSW Gutfeld's notes, the Appeals Council

6    noted that as they pertained to depression, they asserted "a new condition not alleged in

7    the claim and would not meet the durational requirement at the time of [the] decision."  A.T.

8    12.

9        It is not entirely clear, but it appears that the Appeals Council's March 14, 2011

10   decision characterized Dr. Sookra's questionnaire as "incomplete" because the first page of

11   the questionnaire was missing.  It also appears that is the case because the original

12   administrative record filed with this court did not include the first page of Dr. Sookra's

13   fibromyalgia RFC questionnaire.  This court's record has since been supplemented with the

14   complete questionnaire.

15       Although there is nothing in this court's record reflecting Davis' subsequent

16   correspondence with the Appeals Council, it appears that she must have notified the

17   Appeals Council sometime between March 14 and March 16, 2011 regarding the missing

18   page, because, as noted, on March 16, 2011, the Appeals Council gave Davis the

19   opportunity to submit new evidence, and presumably, the missing page to Dr. Sookra's

20   RFC questionnaire.  However, Davis failed to do so, and instead filed the instant appeal.

21   As noted, the Appeals Council subsequently denied review and the ALJ's decision became

22   final.

23                                         **ISSUES**

24       At the outset, the court notes that Davis failed to organize her opening brief into

25   manageable issues.  She raises numerous issues, but unfortunately, her opening brief is

26   not organized issue-by-issue.  Instead, Davis frequently introduces an issue, fails to fully

27   develop the issue, yet then discusses the same issue several pages later in the brief in

28   combination with her discussion of another issue.  With many of her issues, she has also

failed to identify the specific ALJ error and the specific step in the ALJ's analysis at which the error occurred.

Davis' counsel is advised that to the extent he files future social security appeals before this court, he is required in his briefs to specifically set forth the issues, specify the particular ALJ error alleged, and address one issue at a time or they will be rejected and he will be ordered to rewrite them.  Additionally, it is not appropriate to raise issues for the first time in footnotes as Davis' counsel has done in this case.

As a result, the court was required in this case to spend an inordinate amount of time culling out and attempting to clarify the specific issues raised by Davis.  Those issues are as follows:

(1)    Davis is entitled to remand and/or relief based on the Appeals Council's failure to consider in full her post-hearing physician statement and to adequately consider LCSW Gutfeld's post-hearing notes;

(2)    the ALJ erred at step two of his analysis when he failed to classify Davis' headaches as a severe impairment;

(3)    the ALJ erred in several respects in conjunction with his RFC assessment including:

(a)    his failure to credit Davis' pain testimony;

(b)    his failure to adequately consider Davis' obesity; and

(c)    his failure to appropriately consider and/or credit Nurse Meyer's opinion(s) regarding Davis' RFC;

(4)    consideration of the new evidence before the Appeals Council undermines the ALJ's RFC determination and/or requires remand; and

(5)    the ALJ erred in using the Grids at step five to determine that there were jobs Davis can perform when he should have consulted a vocational examiner ("VE").

## DISCUSSION

**1.    Appeals Council's March 14, 2011 Decision**

Davis' challenge to the Appeals Council's decision appears to be two-fold.  First, she contends that the Appeals Council erred when it considered Dr. Sookra's incomplete

**United States District Court**
For the Northern District of California

9

1   questionnaire.  Second, she also appears to challenge the Appeals Council's March 14,

2   2011 decision on the merits, disputing the Appeals Council's treatment of her "new"

3   evidence from Dr. Sookra and LCSW Gutfeld.

4        **a.    Incomplete RFC Questionnaire**

5        Davis suggests simply that a sentence six remand, one in which this court retains

6   jurisdiction, is appropriate based on the Appeals Council "administrative" error in failing to

7   consider the first page of Dr. Sookra's RFC questionnaire.  She cites no authority in support

8   of this request.  The Commissioner does not respond regarding the alleged administrative

9   error other than to contend that on the merits, consideration of Dr. Sookra's full

10  questionnaire would not require reversal of the ALJ's decision.

11       There is nothing in the record regarding with whom fault for the incomplete

12  questionnaire lies.  In arguing that she is entitled to remand based on the Appeals Council's

13  alleged administrative or procedural error, Davis ignores entirely the fact that the Appeals

14  Council provided her an opportunity to re-submit the full document and was willing to re-

15  open and reconsider its denial of her request for review - an opportunity that Davis failed to

16  take.  Instead, Davis chose simply to appeal the Appeals Council's error to this court and

17  did not resubmit any evidence or argument following the Appeals Council's March 16, 2011

18  decision notifying her that she could do so.

19       Given Davis' failure to avail herself of administrative procedures below, along with

20  the fact that there is nothing in the record verifying that it was the Appeals Council's

21  administrative error as opposed to Davis' error, the court DENIES relief under sentence six

22  or otherwise based simply on the allegedly incomplete Appeals Council record.

23       **b.    Appeals Council's Treatment of New Evidence**

24       Additionally, Davis also appears to challenge the Appeals Council's treatment of her

25  new evidence in its March 14, 2011 decision denying review.

26       Regarding Dr. Sookra's questionnaire, Davis contends the Appeals Council was

27  mistaken in its characterization of Dr. Sookra as a non-treating physician and further argues

28  that the new evidence warranted reversal of the ALJ's decision.  Likewise, Davis contends

the Appeals Council did not adequately consider LCSW Gutfeld's mental health progress notes, and challenges the Appeals Council's conclusion that the notes related to a new and separate claim for disability.

The Commissioner responds that the new evidence does not alter the ALJ's decision because Dr. Sookra's questionnaire is less persuasive; the Appeals Council found it repetitive of Nurse Meyer's opinion; and Davis' alleged mental impairment constitutes a new claim for disability.

Davis ignores the fact that an Appeals Council's denial of a request for review is a non-final agency action not subject to judicial review.  Taylor, 659 F.3d at 1231; see also Brewes, 2012 WL 2149465 at *3 (noting that a federal court "do[es] not have jurisdiction to review a decision of the Appeals Council denying a request for review of an ALJ's decision, because the Appeals Council decision is a non-final agency action").  However, "when the Appeals Council considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence."  Brewes, 2012 WL 2149465 at *4.

Based on the above, it is clear that this court may not review the Appeals Council's decision denying review in Davis' case.  However, this court is nevertheless required to consider the new evidence submitted to the Appeals Council, which it does below.

**2.    ALJ's Classification of Davis' Headaches as a Non-Severe Impairment**

As noted, at step two of the sequential analysis, the ALJ determined that Davis' pseudo-tumor was a severe impairment and that her headaches constituted a non-severe impairment.  She now claims in a footnote in her brief that the ALJ erred in not classifying her headaches as a severe impairment.  See Opening Br. at 13. n.7.

In her original disability report, Davis listed "brain tumor" or pseudo-tumor, "extreme pressure behind [her] eyes," and "severe headaches" as conditions that limited her ability to do work.  A.T. 138.  Davis also explained she was taking Diamox for these symptoms, which Dr. Sampson prescribed.  Her treating physician, Dr. Betat confirmed this information in

United States District Court
For the Northern District of California

January 2008, when he noted Davis was taking Diamox and "being actively treated by Dr. Sampson for pseudo tumor cerebri." A.T. 262.

In October 2008, Dr. Egan stated that Davis stopped taking Diamox because it no longer worked for her. A.T. 390. However, Dr. Egan restarted Davis on Diamox and prescribed Topamax for Davis' headaches. A.T. 391. In April 2009, Dr. Egan terminated Davis' prescription for Diamox because her pseudo-tumor was in remission. A.T. 385. Although Davis' insurance carrier stopped covering Topamax for a brief period in 2009, Davis eventually started to take it again and Dr. Egan noted, "her headache improved tremendously." A.T. 383-384. In January 2010, Dr. Egan again mentioned that Topamax helped Davis' headaches and that her pseudo-tumor was in remission. A.T. 380.

At Davis' administrative hearing, she testified that she continued to have headaches, but that Topamax "controlled it enough [so] that [she could] function through the day." A.T. 53.

Davis contends that the ALJ should have classified her headaches as a severe impairment because they interfere with her daily living activities. She argues that although she took Topamax to help control her headaches, she continued to have headaches and related symptoms from her pseudo-tumor. Because the ALJ classified Davis' pseudo-tumor as a severe impairment, Davis asserts the ALJ erred when he did not similarly categorize her headaches as a severe impairment.

A claimant does not have a severe impairment if it is "merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005) (quoting SSR 96-3p (1996)). Furthermore, "an ALJ may find that a claimant lacks a medically severe impairment . . . only when his conclusion is 'clearly established by medical evidence.'" Id. at 687 (quoting SSR 85-28 (1985)).

In this case, there is substantial medical evidence in the record that Davis' headaches are not a severe impairment and do not affect her ability to perform basic work activities. Most notably, Dr. Egan reported more than once that Davis' headaches improved

1    while taking Topamax.  A.T. 380, 383.  Moreover, Davis' admission that Topamax helped

2    her to function through the day supports the conclusion that her headaches did not limit her

3    ability to perform basic work activities.

4            In addition, Davis misinterprets the significance and designation of a severe

5    impairment at step two of the sequential analysis.  Davis argues her headaches interfere

6    with her "daily living" activities.  However, a severe impairment is designated based on the

7    effects of the impairment on the claimant's ability to perform "basic work" activities.  20

8    C.F.R. § 404.1520(c).

9            Accordingly, the ALJ's classification of Davis' headaches as a non-severe impairment

10   was supported by substantial medical evidence in the record.  The court AFFIRMS the ALJ's

11   decision on this issue.

12   **3.    ALJ's Residual Functional Capacity Determination**

13           **a.    ALJ's Failure to Credit Davis' Pain Testimony**

14           Davis also argues that the ALJ erred when he rejected and/or discounted her

15   testimony regarding her subjective complaints.

16           During the April 23, 2010 hearing, Davis testified regarding the pain she experienced

17   from her various conditions.  Initially, Davis asserted she experienced pain as far back as

18   2002.  Davis later explained that her symptoms gradually became worse over the years; she

19   was not sure about what was going on; and that she did not seek immediate medical

20   treatment for her pain because she did not have insurance.  Furthermore, Davis claimed

21   that her pain caused her to constantly move and shift her position when seated.  She

22   explained that when she was seated, she experienced pain in her hips, "all the way up [her]

23   spine," and in her neck, limbs, and in her muscles.  A.T. 58.

24           As noted, the ALJ found that Davis had the RFC to perform at least sedentary work.

25   In conjunction with his RFC determination, the ALJ specifically referenced portions of Davis'

26   pain testimony.  In addition, the ALJ discussed medical expert Dr. Bailey's testimony that

27   Davis' symptoms were possibly due to fibromyalgia.  The ALJ also noted, "[o]bjective

28   medical findings have generally been reported as unremarkable, within normal limits, or

United States District Court
For the Northern District of California

1   mild." A.T. 31.

2        The ALJ then discussed the medical evidence in the record concerning Davis'

3   impairments.  While describing treating physician Dr. Betat's findings, the ALJ highlighted

4   that Davis "complained about 'a lot of aches and pains in multiple area[s], but then

5   according to her previous history she has had some form of arthritis for more than fifteen

6   years.'"  A.T. 32.  Furthermore, the ALJ described that Dr. Betat "assessed that [Davis]

7   might be considered to have some form of fibromyalgia, but he did not think she was

8   necessarily permanently disabled."  A.T. 32.

9        The ALJ also described a report from consultative examiner Dr. Madani, as well as

10  state medical consultants' reports, which found that Davis could perform "light work."  A.T.

11  32.  The ALJ modified Dr. Madani's and the consultants' RFC assessments to reflect a more

12  conservative RFC for Davis because he found that they did not adequately account for

13  Davis' subjective complaints and obesity.

14        In addition, the ALJ referenced some of Dr. Sookra's findings from April 2009, in

15  which he noted that Davis experienced pelvic pain.  The ALJ opined that "[e]xcept for

16  possibly myocardial ischemia in August 2009, Dr. Sookra's later examinations and clinical

17  findings were unremarkable."  A.T. 33.  Furthermore, the ALJ observed that at some point

18  shortly thereafter, Nurse Meyer "treated the claimant from then on."  A.T. 33.  The ALJ gave

19  little weight to one of Nurse Meyer's assessments because it was inconsistent with Dr.

20  Madani's evaluation, conflicted with other evidence in the record and according to medical

21  expert Dr. Bailey, it was based on subjective complaints and limitations.

22        The ALJ concluded his RFC determination, finding that Davis' "medically

23  determinable impairments could reasonably be expected to cause some of the type[s] of

24  alleged symptoms;" but that her statements as to "the intensity, persistence and limiting

25  effects of [the] symptoms [was] not credible to the extent they [were] inconsistent with . . .

26  [Davis'] residual functional capacity assessment."  A.T. 33.  The ALJ reasoned that "[t]he

27  nature and extent of treatment and activity limitations [were] not consistent with the alleged

28  degree of severity."  A.T. 33-34.  Moreover, the ALJ found that Davis' time spent as a

1   part-time housekeeper supported his conclusion that Davis could perform sedentary work.

2        Davis contends the ALJ failed to properly evaluate her subjective complaints.  She

3   notes that the ALJ found her fibromyalgia to be a severe impairment, and cites a Ninth

4   Circuit case, which she asserts stands for the proposition that the ALJ was required to credit

5   her pain testimony as a matter of law because she suffered from fibromyalgia.  See

6   Benecke v. Barnhart, 379 F.3d 587 (9th Cir. 2004).  She argues that because her

7   fibromyalgia diagnosis was not rejected by any of her physicians, the ALJ's discrediting of

8   her subjective complaints required objective evidence, and that the ALJ failed to provide

9   clear and convincing reasons for rejecting her pain testimony.

10        An ALJ applies a two-step process to evaluate the credibility of a claimant's pain

11   testimony or subjective complaints.  Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir.

12   2007).  At the first step, an "ALJ must determine whether the claimant has presented

13   objective medical evidence of an underlying impairment 'which could reasonably be

14   expected to produce the pain or other symptoms alleged.'"  Id. at 1036 (quoting Bunnell v.

15   Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  The claimant "'need not show that

16   her impairment could reasonably be expected to cause the severity of the symptom she has

17   alleged; she need only show that it could reasonably have caused some degree of the

18   symptom.'"  Id. (quoting Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996)).

19        At the second step, unless there is evidence of malingering, "'the ALJ can reject the

20   claimant's testimony about the severity of her symptoms only by offering specific, clear and

21   convincing reasons for doing so.'"  Id.  (quoting Smolen, 80 F.3d at 1281).  Moreover,

22   "[g]eneral findings are insufficient; rather, the ALJ must identify what testimony is not

23   credible and what evidence undermines the claimant's complaints."  Lester v. Chater, 81

24   F.3d 821, 834 (9th Cir. 1995) (citing Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993)).

25        When determining the claimant's credibility, an ALJ may consider a variety of factors,

26   which include the "'[claimant's] reputation for truthfulness, inconsistencies either in [the

27   claimant's] testimony or between [her] testimony and [her] conduct, [the claimant's] daily

28   activities, [her] work record, and testimony from physicians and third parties concerning the

United States District Court
For the Northern District of California

15

1  nature, severity, and effect of the symptoms of which [the claimant] complains.'"  Thomas,

2  278 F.3d at 958-59 (quoting Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997)).

3  Furthermore, "[i]f the ALJ's credibility finding is supported by substantial evidence in the

4  record, we may not engage in second-guessing."  Id. at 959 (citing Morgan v. Comm'r of

5  Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999)).

6          In this case, the ALJ clearly utilized the requisite two-step inquiry set forth above.

7  There is no dispute that the ALJ found that Davis satisfied the first step of the credibility

8  inquiry in concluding that Davis' "medically determinable impairments could reasonably be

9  expected to cause some of the type[s] of alleged symptoms . . . ."  A.T. 33.  The issue

10 therefore is whether the ALJ provided clear and convincing reasons for discounting the

11 severity of Davis' pain testimony.

12         In Benecke, the case relied on by Davis, the Ninth Circuit upheld the district court's

13 determination that an ALJ erred in discrediting the claimant's pain testimony based on her

14 fibromyalgia, as well as the opinions of her treating physicians.  379 F.3d at 593-94.  The

15 court noted that "[f]ibromyalgia's cause is unknown, there is no cure, and it is

16 poorly-understood within much of the medical community."  Id. at 590.  Furthermore, "[t]he

17 disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms."

18 Id.  The Benecke court then explained that the ALJ in that case erred in rejecting the

19 claimant's subjective complaints because "the ALJ relied largely on [the claimant's] ability to

20 carry out certain routine tasks."  Id. at 594.  This was despite the fact that the claimant's

21 "daily activities [were] quite limited and carried out with difficulty."  Id.

22         By contrast, subsequently, in Burch v. Barnhart, the Ninth Circuit found that an ALJ

23 provided clear and convincing reasons for partially rejecting a claimant's subjective

24 complaints based primarily on her back pain.  400 F.3d 676, 680-81 (9th Cir. 2005).  The

25 Burch court explained that the ALJ based his credibility determination on objective medical

26 findings, the claimant's daily living activities, inconsistent treatment, as well as the claimant's

27 inability to actually seek treatment for other conditions.  Id.

28         As for daily living activities, the Burch court explained that "if a claimant engages in

16

numerous daily activities involving skills that could be transferred to the workplace, the ALJ may discredit the claimant's allegations upon making specific findings relating to those activities." Id. at 681 (citing Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)). The court found that "[a]lthough the evidence of [the claimant's] daily activities may also admit [to] an interpretation more favorable to [the claimant], the ALJ's interpretation was rational, and '[w]e must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.'" Id. at 680-81 (quoting Magallanes, 881 F.2d at 750).

In addition, the Burch court explained that the ALJ properly considered and pointed out objective medical findings to discredit the claimant's pain testimony. Id. at 681. "Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." Id.

Davis' argument that her fibromyalgia diagnosis alone automatically warrants acceptance of her subjective complaints lacks merit. Like Burch, the court finds that the ALJ here gave clear and convincing reasons for discrediting Davis' pain testimony. The ALJ noted Davis' daily living activities, specifically noting that Davis told a consultative examiner she enjoyed playing with her dogs and performed housework, despite performing the work at a slow pace. The ALJ also highlighted that Davis spent time as a part-time housekeeper after her alleged onset date.

Additionally, like Burch, the ALJ also relied on the objective medical evidence available in the record to discredit Davis' subjective complaints. The ALJ's RFC determination noted that Davis' "[o]bjective medical findings have generally been reported as unremarkable, within normal limits, or mild." A.T. 31. Furthermore, the ALJ noted a "rheumatoid arthritis (RA) screen in February 2006 was negative." A.T. 31. Likewise, he noted that "[l]aboratory studies in July 2007 were negative for both ANA and a RA screen." A.T. 31. Thus, the ALJ found that objective medical findings did not support Davis' subjective complaints.

The ALJ further considered Davis' treatment for her various symptoms and impairments. The ALJ noted Dr. Egan's medical findings, in which the doctor found that

United States District Court
For the Northern District of California

1  Davis' pseudo-tumor went into remission after she took Diamox and her headaches

2  "improved tremendously" after she took Topamax.  A.T. 33.  This demonstrates the ALJ had

3  a basis for determining that the extent of Davis' treatment was not consistent with the

4  severity of her subjective complaints.  Additionally, the ALJ described treating physician Dr.

5  Betat's findings who "assessed that [Davis] might be considered to have some form of

6  fibromyalgia, but he did not think she was necessarily permanently disabled."  A.T. 32.  In

7  other words, Dr. Betat, one of Davis' treating physicians, had his doubts that Davis'

8  fibromyalgia made her permanently disabled.

9       Finally, the ALJ's modification of Dr. Madani's overall assessment of Davis, as well as

10  those of the state medical consultants' reports to a more conservative functional capacity

11  clearly demonstrates that the ALJ considered Davis' subjective complaints and he took her

12  pain into account when concluding that she was still capable of at least sedentary work.

13       In conclusion, the ALJ provided clear and convincing reasons in his RFC

14  determination for discrediting Davis' subjective complaints.  Therefore, the court AFFIRMS

15  the ALJ on this issue.

16       **b.**    **ALJ's Consideration of Davis' Obesity**

17       Again, without adequately pinpointing the specific ALJ error, Davis appears to assert

18  that the ALJ failed to adequately consider her obesity in his RFC determination.

19       The ALJ found that Davis' obesity constituted a severe impairment.  At step three, the

20  ALJ made reference to Social Security Ruling 02-1p and the fact that he considered the

21  combined effects of Davis' obesity on her ability to perform within a work setting.

22       Davis argues the ALJ's consideration of her obesity was "cursory," and she cites

23  Social Security Ruling 00-3p, for the proposition that "as with any other impairment, [an ALJ]

24  will explain how [he] reached [his] conclusions on whether obesity caused any physical or

25  mental limitations."  SSR 003-p (2000); see SSR 02-1p (2002) (superseding SSR 003-p).[3]

26

27  _____

28       [3]Although Social Security Rulings do not have the same weight as law, they are entitled to some deference if they are congruent with Social Security Act regulations.  Avenetti v. Barnhart, 456 F.3d 1122, 1124 (9th Cir. 2006).

**United States District Court**
For the Northern District of California

1    In contrast, the Commissioner argues "[o]besity may . . . enter into a multiple

2 impairment analysis, but only by dint of its impact upon the claimant's musculoskeletal,

3 respiratory, or cardiovascular system." Celaya v. Halter, 332 F.3d 1177, 1181 n.1 (9th Cir.

4 2003).  Further, the Commissioner contends Davis has failed to specify what limitations her

5 obesity has caused, and also argues that Davis' own testimony and prior work history

6 contradict her argument that her obesity prevents her from working.

7    An ALJ must consider obesity "as a factor contributing to [the claimant's] disability."

8 Hammock v. Bowen, 879 F.2d 498, 504 (9th Cir. 1989).  When considering the claimant's

9 obesity and RFC, "the ALJ's assessment 'must consider an individual's maximum remaining

10 ability to do sustained work activities in an ordinary work setting on a regular and continuing

11 basis.'"  Burch, 400 F.3d at 683 (quoting SSR 02-1).  "A 'regular and continuing basis'

12 means 8 hours a day, for 5 days a week, or an equivalent work schedule."  SSR 02-1p.  "As

13 with other impairments, the ALJ should explain how he determined whether obesity caused

14 any physical or mental impairments."  Burch, 400 F.3d at 683 (citing SSR 02-1p).

15 Additionally, SSR 96-8p provides:

16    In assessing RFC, the adjudicator must consider only limitations and
      restrictions imposed by all of an individual's impairments, even those that are

17    not "severe."  While a "not severe" impairment(s) standing alone may not
      significantly limit an individual's ability to do basic work activities, it may –

18    when considered with limitations or restrictions due to other impairments – be
      critical to the outcome of a claim.

19

20 Id. (quoting SSR 96-8p (1996)).

21    In Celaya v. Halter, the Ninth Circuit held that an ALJ should consider the effects of a

22 claimant's obesity on the individual's other impairments, health and ability to work.  332 F.3d

23 at 1182.  In Celaya, the claimant was illiterate and pro se and she was found to have

24 diabetes and hypertension.  Id. at 1179, 1182.  The Ninth Circuit concluded the ALJ did not

25 adequately develop the record and failed to consider the effects of the claimant's obesity on

26 the claimant's other impairments.  Id.

27    In Burch, however, the Ninth Circuit distinguished Celaya, and held that an ALJ

28 adequately considered a claimant's obesity where there was nothing in the record to

United States District Court
For the Northern District of California

1   suggest the claimant's "obesity exacerbated her other impairments."  400 F.3d at 682.  The

2   <u>Burch</u> court found that the ALJ properly considered the claimant's obesity as it related to the

3   ALJ's RFC determination because the ALJ acknowledged physicians' notes regarding the

4   claimant's obesity, as well as possible effects of the obesity on the claimant's back

5   problems.  <u>Id.</u> at 684.  Furthermore, the court noted neither the claimant, nor the evidence in

6   the record, presented "any functional limitations as a result of [the claimant's] obesity that

7   the ALJ failed to consider."  <u>Id.</u>

8           Like <u>Burch</u>, the ALJ here adequately considered Davis' obesity in his RFC

9   determination.  Most importantly, Davis has failed to cite any medical evidence in the record

10  from her various physicians that her obesity exacerbated her other impairments or functional

11  limitations.  Although Davis cites social security rulings for conditions and limitations that can

12  be affected by obesity, Davis has not established that her obesity exacerbated her

13  impairments or prevented her ability to work.

14          Moreover, while Davis testified that she has problems with her fine motor skills and

15  experienced fatigue, she did not testify that her obesity caused these limitations or

16  symptoms.  In fact, Davis actually stated, "I may be big but I was a hard worker, believe it or

17  not.  I worked hard doing a lot of stuff.  I was very active."  A.T. 56.  Her remaining testimony

18  similarly fails to suggest that her obesity had an effect on her functional limitations or ability

19  to do work.

20          Because the ALJ complied with SSR 02-1p and properly considered the effects of

21  Davis' obesity on her ability to perform within a work setting, the court finds that the ALJ

22  properly considered Davis' obesity in his RFC determination.  This conclusion is also

23  supported by the ALJ's recognition that Dr. Madani's assessment and the state medical

24  consultants' reports did not adequately take into account Davis' subjective complaints and

25  obesity.  For this reason, the court AFFIRMS the ALJ on this issue.

26          **c.    ALJ's Limited Treatment of Nurse Practitioner Meyer's Opinion**

27          Davis also contends the ALJ erred in his RFC determination because he failed to

28  afford the appropriate deference to Nurse Meyer's assessment.

20

United States District Court
For the Northern District of California

1   As part of his RFC determination, the ALJ discussed evidence in the record from

2   Nurse Meyer.  Beginning in 2008, Nurse Meyer examined Davis on several occasions.  A.T.

3   309-324, 337-357.  In February 2010, she completed a medical source statement on her

4   own, which diagnosed Davis with degenerative arthritis and fibromyalgia.  A.T. 369.  In that

5   statement, she assessed Davis "to be capable of less than sedentary activity due to muscle

6   and joint pain, as well as fatigue."  A.T. 33.

7   As noted, the ALJ gave little weight to Nurse Meyer's assessment of Davis'

8   limitations, reasoning that her assessment was "inconsistent with the assessment provided

9   by Dr. Madani and with the weight of the evidence."  A.T. 33.  Moreover, the ALJ also stated

10  that Dr. Bailey, who testified as a medical expert, found Nurse Meyer's findings to be "based

11  on [Davis'] subjective symptoms and limitations."  A.T. 33.

12  Davis asserts Nurse Meyer's evaluation should have been treated as that of an

13  acceptable medical source and that it was therefore entitled to the same amount of

14  deference as a treating physician.

15  The Commissioner counters that Davis is mistaken regarding the appropriate

16  treatment of Nurse Meyer's opinion because Davis relies on Ninth Circuit case law that itself

17  cites a now non-existent regulation for the premise that a nurse practitioner can be treated

18  as an acceptable medical source if she is working with a physician.  See Gomez v. Chater,

19  74 F.3d 967, 970-71 (9th Cir. 1996).  Notwithstanding this fact, the Commissioner

20  nevertheless contends the ALJ did not err because he simply gave Nurse Meyer's

21  assessment less weight based on other evidence in the record.

22  It is not entirely clear under current Ninth Circuit law whether a nurse practitioner

23  such as Nurse Meyer may be considered an "acceptable medical source."  Physician's

24  assistants, nurse practitioners, and chiropractors (among others) are medical professionals,

25  but they are not "acceptable medical sources" under the Social Security regulatory

26  framework.  20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1).  The evaluations of a claimant by

27  these medical professionals are considered evidence from "other sources."  Id.  The

28  distinction between "other sources" and an "acceptable medical source" is important

21

1  because only an "acceptable medical source" may be considered a "treating source."  See

2  20 C.F.R. §§ 404.1502, 416.902.  The opinions of treating sources are generally entitled to

3  controlling weight or at least deference by adjudicators.  See Lester, 81 F.3d at 830.

4         In addition to "acceptable medical sources," an ALJ may nevertheless examine "other

5  sources to show the severity of [a claimant's] impairment(s) and how it affects [her] ability to

6  work."  20 C.F.R. § 404.1513(d).  "Other sources" include other "medical sources" such as

7  evidence from nurse practitioners and physicians' assistants.  20 C.F.R.

8  § 404.1513(d)(1).

9         In Gomez, the Ninth Circuit carved out an important exception to the general rule that

10  nurse practitioners constitute "other sources," and are not "acceptable medical sources."  74

11  F.3d at 971.  In Gomez, the court held that the opinion of a nurse practitioner was properly

12  ascribed to the supervising physician and treated as an opinion from an "acceptable medical

13  source" because the record indicated that the nurse practitioner worked so closely under the

14  supervision of the physician that she became the agent of the physician.  Id.  Although the

15  Gomez court did not provide specific examples of the type of evidence that established this

16  agency relationship, it did indicate that the nurse practitioner consulted with the physician

17  regarding the claimant's treatment on numerous occasions.  Id.  The court also reasoned

18  that, pursuant to 20 C.F.R. § 416.913(a)(6), "[a] report of an interdisciplinary team that

19  contains the evaluation and signature of an acceptable medical source is also considered

20  acceptable medical evidence."  Id.  The court concluded that a plain reading of paragraph

21  (a)(6) in conjunction with the definition of "other source" evidence "indicate[d] that a nurse

22  practitioner working in conjunction with a physician constitutes an acceptable medical

23  source, while a nurse practitioner working on his or her own does not."  Id.

24         Following the Ninth Circuit's decision in Gomez, the regulation relied on by the court

25  in that case, 20 C.F.R. § 416.913(a)(6), was revised, and paragraph (a)(6) was removed,

26  along with any reference to an "interdisciplinary team" as an acceptable medical source.  65

27  Fed.Reg. 34950, 34952 (July 3, 2000). The agency explained that its revision was a

28  recognition that paragraph (a)(6) was "redundant and somewhat misleading" because

**United States District Court**
For the Northern District of California

1  acceptable medical sources are individuals; thus, to be evidence from an "acceptable

2  medical source," the report or evaluation would still have to be provided and signed by the

3  acceptable medical source regardless of whether that source was part of an interdisciplinary

4  team.  See id.  Ultimately, this clarified the agency's position that a report from an

5  interdisciplinary team member who is not an acceptable medical source is not transformed

6  into an evaluation from an acceptable medical source because of participation on the team.

7  Id.  Rather, to be treated as evidence from an acceptable medical source, the evaluation

8  must be provided by an individual listed in the regulations as an acceptable medical source.

9  See 20 C.F.R. §§ 404.1513(a), 416.913(a).

10         District courts have split on the issue regarding whether Gomez is still good law

11  following the revisions to the regulation.  See Vasquez v. Astrue, 2009 WL 939339 at *6 n.3

12  (E.D. Wash. 2009) (the holding in Gomez was essentially abrogated by the July 2000

13  revisions to § 416.913(a)); cf. Garcia v. Astrue, 2011 WL 3875483 (E.D. Cal. 2011); Nichols

14  v. Comm'r of Soc. Sec. Admin., 260 F.Supp.2d 1057, 1066–67 (D. Kan. 2003); Ramirez v.

15  Astrue, 2011 WL 1155682 at *4-5 (C.D. Cal. 2011).  The majority of the district courts,

16  however, appear to be of the view that the July 2000 revision to § 416.913 did not undercut

17  the exception in Gomez, but it instead indicated how narrowly the exception should be

18  drawn.  See Garcia, 2011 WL 3875483 at *11; Ramirez, 2011 WL 1155682 at *4–5; Nichols,

19  260 F.Supp.2d at 1066.  These courts have held that following the revision, Gomez stands

20  for the proposition that "[o]nly in circumstances that indicate an agency relationship or close

21  supervision by an 'acceptable medical source' will evidence from an 'other source' be

22  ascribed to the supervising 'acceptable medical source.'"  Garcia, 2011 WL 3875483 at *13.

23         The majority view regarding Gomez's continuing viability is persuasive, especially

24  since the Ninth Circuit recently cited to Gomez in Taylor, noting that the opinions of nurse

25  practitioners should be treated as "acceptable medical sources" as long as the nurse

26  practitioner is "working closely with, and under the supervision of, [a physician] . . . ."  659

27  F.3d at 1234 (citing Gomez, 74 F.3d at 971).  Additionally, following Taylor, in Molina v.

28  Astrue, the Ninth Circuit recognized that Gomez relied on an outdated regulation, but chose

1  not to resolve whether <u>Gomez</u> remained good law, instead distinguishing it on the facts

2  because the physicians' assistant at issue in <u>Molina</u> worked alone.  674 F.3d 1104, 1111 &

3  n.3 (9th Cir. 2012).  The Ninth Circuit thus has not directly addressed the viability of its

4  decision in <u>Gomez</u> following the repeal of the regulation.

5        Nevertheless, assuming <u>Gomez</u> may still be considered good law, district courts have

6  interpreted its exception narrowly.  <u>See</u>, <u>e.g.</u>, <u>Ramirez</u>, 2011 WL 1155682 at *4 (physician's

7  co-signature on client-plan prepared by a social worker did not indicate that the social

8  worker was under close supervision of the physician in treating or in preparing the reports,

9  thus social worker's evaluation was not from an "acceptable medical source"); <u>Vasquez</u>,

10  2009 WL 939339 at *6 n.3 (physician's assistant's report "signed off" by a superior believed

11  to be a doctor did not constitute "acceptable medical source" opinion); <u>Nichols</u>, 260

12  F.Supp.2d at 1066–67 (distinguishing <u>Gomez</u> where physician signed the report of a nurse

13  practitioner but no evidence indicated that nurse practitioner consulted with the physician

14  during the course of the patient's treatment and concluding opinion was not from an

15  acceptable medical source).

16        Here, even assuming that <u>Gomez</u> remains good law, the facts of this case do not

17  support affording Nurse Meyer the status of an "acceptable medical source."  Although

18  Nurse Meyer worked at times with both Dr. Betat and Dr. Sookra, Nurse Meyer's medical

19  source statement relied upon by Davis does not include either of their signatures.  A.T. 369-

20  373.  Moreover, the ALJ also observed that at some point after August 2009, it appeared

21  that Nurse Meyer "treated the claimant from then on."  A.T. 33.  <u>Gomez</u> does not stand for

22  the proposition that any medical professional, who would not otherwise be considered an

23  "acceptable medical source," is transformed into an "acceptable medical source" merely

24  because he or she is supervised to any degree by a physician.  <u>See Ramirez</u>, 2011 WL

25  1155682 at *4-5.  There is no evidence here that because of close supervision by other

26  treating physicians, Nurse Meyer was transformed from an "other source" to the agent of an

27  "acceptable medical source" by virtue of her participation on an interdisciplinary team and

28  close interaction with treating source physicians.

1    However, even if by some stretch Nurse Meyer could be considered an "acceptable

2  medical source" and not just an "other source," the ALJ's reasons for rejecting her opinions

3  in part were sufficient.  In social security cases, "[i]n order to reject the testimony of a

4  medically acceptable treating source, the ALJ must provide specific, legitimate reasons

5  based on substantial evidence in the record."  Molina, 674 F.3d at 1111 (citing Valentine v.

6  Comm'r of Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009).  The ALJ found that Nurse

7  Meyer's assessment was inconsistent with Dr. Madani's evaluation and the weight of other

8  evidence.  The ALJ was justified to conclude that Nurse Meyer's opinion conflicted with

9  other evidence in the record.

10    Moreover, additional evidence, including the state medical consultants' reports, which

11  found that Davis was capable of light work, also supports the ALJ's treatment of Nurse

12  Meyer's opinion.  As previously mentioned, the ALJ modified Dr. Madani's evaluation and

13  the state medical consultants' reports to a more limited functional capacity because of Davis'

14  subjective complaints and obesity.  This demonstrates that the ALJ did not discount Nurse

15  Meyer's opinion solely in favor of Dr. Madani's assessment.  Likewise, it also demonstrates

16  that the ALJ did not base his decision entirely on Dr. Bailey's opinion that Nurse Meyer's

17  assessment was based on subjective complaints.

18    Accordingly, this court AFFIRMS the ALJ on this issue.

19  **4.    New Evidence Before the Appeals Council**

20    As noted above, when reviewing the Commissioner's final decision for substantial

21  evidence, this court is required to consider the new evidence submitted to the Appeals

22  Council.  Brewes, 2012 WL 2149465 at *4.

23    **a.    Dr. Sookra's Post-Hearing Fibromyalgia RFC Questionnaire**

24    Dr. Sookra's post-hearing fibromyalgia RFC questionnaire is most significant as it

25  relates to the ALJ's RFC determination.  In particular, the questionnaire most closely

26  pertains to the ALJ's decision to discredit Davis' subjective complaints and the ALJ's

27  treatment of Nurse Meyer's opinion.

28    Davis contends the questionnaire highlights her specific exertional and nonexertional

limitations, which the ALJ failed to consider.  Moreover, Davis argues that case law and the

American College of Rheumatology's criteria for fibromyalgia demonstrate that fibromyalgia

is based on subjective complaints, and requires an extended period of time to properly

evaluate.  Because the questionnaire comes from a treating physician, Davis also argues

that it would change the ALJ's RFC decision.  Accordingly, she contends that the court

should remand the case so that the ALJ may consider the report.

Based on the applicable legal standards and other evidence in the record, Dr.

Sookra's questionnaire does not warrant reversal of the ALJ's RFC decision.  As explained

in detail above, the ALJ provided clear and convincing reasons for discrediting Davis'

subjective complaints.  The ALJ based his credibility determination on substantial evidence

in the record in concluding that Davis' subjective complaints were unreliable.  For example,

the ALJ referenced Davis' daily activities and that she worked as a part-time housekeeper

after her alleged onset date.  In addition, the ALJ considered objective medical evidence,

Davis' treatment with medication, and the opinions from her physicians.  Furthermore, the

ALJ actually modified Dr. Madani's overall assessment of Davis, as well as state medical

consultants' reports, to a more limited functional capacity.  In light of these facts, Dr.

Sookra's questionnaire would not undermine the ALJ's credibility determination.  Because

the ALJ gave clear and convincing reasons for discounting Davis' pain testimony, which

were backed by substantial evidence in the record, Dr. Sookra's post-hearing fibromyalgia

RFC questionnaire does not present a basis for reversing the ALJ's RFC decision.

Moreover, for the reasons set forth above, the ALJ was justified in rejecting in part

Nurse Meyer's opinion as inconsistent with other evidence in the record, including Dr.

Madani's opinion.  That same reasoning would apply to Dr. Sookra's questionnaire.[4]

Because the ALJ found Nurse Meyer's opinion to be inconsistent with the weight of the other

---

[4] In many respects, Nurse Meyer's questionnaire was actually more advantageous to Davis than Dr. Sookra's questionnaire.  For example, while Nurse Meyer indicated Davis "constantly" experienced pain, enough to interfere with her attention and concentration to perform work tasks, Dr. Sookra indicated Davis "frequently" experienced pain.  Likewise, Nurse Meyer indicated Davis was incapable of even low stress jobs in terms of tolerable work stress, while Dr. Sookra similarly indicated Davis was capable of low stress jobs.

United States District Court
For the Northern District of California

1   evidence in the record, Dr. Sookra's questionnaire would have had little impact given the

2   RFC evidence otherwise in the record.

3          In conclusion, it is unlikely Dr. Sookra's assessment would alter the ALJ's RFC

4   determination, and because this is the case, reversal or a remand on this basis is

5   unnecessary.  However, this court is reversing and remanding with respect to the ALJ's step

6   five decision as discussed below.  Given that the questionnaire is now part of the record, the

7   ALJ is required to consider it in the context of the step five proceedings on remand.

8          **b.     LCSW Kevin Gutfeld's Mental Health Progress Notes**

9          As set forth above, the Appeals Council stated that to the extent LCSW Gutfeld's

10  notes pertained to depression, they asserted "a new condition not alleged in the claim and

11  would not meet the durational requirement at the time of [the] decision."  A.T. 12.  However,

12  as noted above, this court is without jurisdiction to review that determination since it was not

13  a final decision of the Commissioner.

14         Contrary to the Appeals Council's determination, Davis contends that the progress

15  notes do not relate to a new claim for disability and that they actually concern her mental

16  and nonexertional limitations at the time of her original claim for disability.  The

17  Commissioner counters that the progress notes indeed allege a new claim for disability.

18  Because they post-date the ALJ's decision, the Commissioner argues Davis should file a

19  new disability application if she claims her depression warrants disability benefits.

20         Like Dr. Sookra's post-hearing fibromyalgia RFC questionnaire, LCSW Gutfeld's

21  mental health progress notes are most relevant to the ALJ's RFC determination.

22         Davis' claim for disability focused on her other impairments.  This is evident in Davis'

23  original disability report where she did not specifically list that her anxiety or depression

24  limited her ability to do work.  A.T. 137-145.  Davis also noted that at the time that she did

25  not see anyone for mental health problems.  A.T. 140.

26         Additionally, the ALJ highlighted in his RFC determination that in March 2008, a state

27  agency psychological consultant determined that Davis' anxiety-related disorder was not

28  severe.  A.T. 33, 228.  The ALJ noted Davis had "no restriction in activities of daily living, no

difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence, or pace, and that there had been no episodes of decompensation." A.T. 33. Based on this report, the ALJ was justified in his determination that Davis' anxiety allowed her to perform at least sedentary work.

Given that there is substantial evidence in the record that Davis did not satisfy her burden in the first four steps of the sequential analysis to establish that she suffered from a mental impairment, the court concludes that LCSW Gutfeld's mental health progress notes would not change the ALJ's RFC determination.

However, because this court is reversing and remanding with respect to the ALJ's step five decision as discussed below and given that the questionnaire is now part of the record, the ALJ is required to consider it in the context of the step five proceedings on remand.

**5.   ALJ's Application of the Medical-Vocational Guidelines and Failure to Seek Vocational Expert Testimony**

At step five of the sequential analysis, the ALJ held that there were a significant number of jobs within the national economy that Davis can perform.  The ALJ based his decision on Davis' RFC, age, education, work experience and application of Medical-Vocational Guidelines (the "Grids").  The ALJ relied on the Grids, and did not seek vocational expert testimony to determine the types or number of jobs within the national economy that Davis could perform.

Davis asserts that the ALJ erred at step five because he improperly relied on the Grids and failed to seek vocational expert ("VE") testimony.  Davis contends she has nonexertional limitations in addition to her exertional limitations, which she asserts precluded the ALJ from relying solely on the Grids at step five of the sequential analysis.  Davis argues that both fibromyalgia and obesity - two of the impairments the ALJ found to be severe - cause nonexertional impairments.  She also argues that her pain results in significant non-exertional limitations, and notes evidence that she lacks fine motor skills and suffers from vision-related problems.

United States District Court
For the Northern District of California

The Commissioner counters that the ALJ found only exertional limitations - as opposed to nonexertional limitations - and thus that the ALJ properly applied the Grids.

At step five, the burden shifts to the Social Security Administration to demonstrate that there are other jobs that exist in significant numbers in the national economy which the claimant could reasonably perform. 20 C.F.R. § 404.1560(b)(3); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999). The Commissioner can meet the burden of demonstrating appropriate jobs in "significant numbers" in one of two ways. Tackett, 180 F.3d at 1101. The ALJ can either hear the testimony of a vocational expert ("VE") or can refer to the Medical-Vocational Guidelines (commonly known as the "Grids") found at 20 C.F.R. pt. 404, subpt. P, app. 2. Id.

The Grids are "a matrix system for handling claims that involve substantially uniform levels of impairment." Id.; see 20 C.F.R. pt. 404, subpt. P, app 2. They provide the Commissioner an efficient means for assessing claims in a uniform and streamlined fashion. Id. The efficiency of the Grids justifies the ALJ's use thereof, as opposed to a VE, only when the Grids "*completely and accurately* represent a claimant's limitations." Id. (emphasis in original). "In other words, a claimant must be able to perform the *full range* of jobs in a given category, i.e., sedentary work, light work, or medium work." Id.

A "non-exertional impairment" is an impairment that limits the claimant's ability to work "without directly affecting his or her strength." Desrosiers v. Secretary of Health and Human Servs., 846 F.2d 573, 579 (9th Cir. 1988) (Pregerson, J., concurring) (internal citations omitted). The Ninth Circuit has recognized that significant non-exertional impairments may render reliance on the Grids inappropriate. Id. at 577. Significantly, however, a mere allegation of a non-exertional limitation does not automatically preclude application of the Grids, and should not allow a claimant to make an end run around the more efficient Grids evaluation. Id. By the same token, however, the Desrosiers court observed that "[a] non-exertional impairment, if sufficiently severe, may limit the claimant's functional capacity in ways not contemplated by the guidelines." Id. In such a case, the Grids are inapplicable. Id. The ALJ should first determine if a claimant's non-exertional

1   limitations significantly limit the range of work permitted by his exertional limitations.  Id.

2          The Ninth Circuit, in Bruton v. Massanari, articulated the appropriate scope of an

3   ALJ's use of the Grids.  268 F.3d 824, 827-28 (9th Cir. 2001).  In Bruton, a doctor's medical

4   report stated that the claimant was "prophylactically precluded" from prolonged work at or

5   above the shoulder level.  Id. at 828.  The doctor's medical report suggested that the

6   claimant's shoulder impairments may have amounted to a non-exertional limitation and,

7   "[b]ecause Bruton may have that impairment," the court concluded that the Commissioner

8   could not appropriately rely on the Grids, and should, instead, rely on the testimony of a VE.

9   Id. (emphasis added).

10         Here, Davis is correct that the ALJ did not make specific findings regarding her non-

11  exertional limitations.  However, contrary to the Commissioner's position, this does not

12  mean that he found that Davis had none.  To the contrary, obesity and fibromyalgia in and of

13  themselves constitute non-exertional impairments, and in this case, the ALJ found that they

14  were "severe" or significant.  See Wilson v. Commissioner of Social Sec., 2008 WL 5268548

15  at *2 (9th Cir. 2008) (noting that "[b]ecause the limitations caused by the pain of fibromyalgia

16  and the fatigue of [chronic fatigue syndrome] are non-exertional limitations, vocational

17  expert testimony was required"); Lucy v. Chater, 113 F.3d 905 (8th Cir. 1997) (obesity is a

18  nonexertional impairment).  Moreover, the mere possibility, rather than certainty, that Davis

19  suffers from a non-exertional limitation, is enough to overcome the interest in judicial

20  efficiency, and to mandate VE testimony on the topic.  Bruton, 268 F.3d at 828.  Notably, the

21  ALJ had a VE at the hearing, but chose to apply the Grids, rather than availing himself of the

22  VE's testimony.  In this case, the Grids did not "completely and accurately" represent Davis'

23  limitations, as required by Tackett for proper Grids use.  180 F.3d at 1101.  Because Davis'

24  alleged non-exertional impairments could potentially interfere with her ability to perform the

25  full range of sedentary work, the ALJ was required to call upon the VE.

26         Based on this error, the court remands the case to the ALJ for further proceedings.

27  Specifically, the ALJ is required to call a vocational expert at step five to ascertain based

28  both on Davis' exertional and non-exertional limitations, whether there are indeed jobs

available in the national economy for her.  In doing so, the ALJ and VE should take into

account the new evidence previously submitted before the Appeals Council.  This should

include the complete questionnaire from Dr. Sookra and LCSW Gutfeld's progress notes.

Additionally, in conjunction with this step five argument, the court notes that Davis

suggests that the ALJ failed to consider several limiting non-severe impairments, including:

myocardial ischemia, poor exercise tolerance, coronary artery disease, near syncope,

osteoarthritis, bilateral severe papilledema, and pervasive pain.  See Davis' ALJ Pre-

Hearing Brief, A.T. 189-192.  Additionally, Davis cites a function report previously before the

ALJ to assert that she suffers from sleep disruption, A.T. 159, limited cardiac ability, A.T.

163, and an inability to finish what she starts, A.T. 163; and further cites to an evaluation by

Dr. Egan for the proposition that she has "significant issues with depression."  A.T. 382.

Finally, Davis contends she lacks fine motor skills based on her testimony given at the

administrative hearing.

Although such an argument would normally be directed at step three of the ALJ's

analysis in conjunction with an argument that the ALJ failed to consider the combined

effects of all of these impairments, or would be directed at the ALJ's RFC analysis, Davis

has not fashioned it as such.  Instead, Davis seems to cite to all of these non-severe

impairments for the proposition that they should have been considered by a VE at step five

in determining what jobs she was capable of performing.

However, as is the case throughout her brief, Davis has failed to make clear what

exactly her challenge is with respect to this evidence.  To the extent that Davis intended to

challenge the ALJ's step three or RFC analysis, this court concludes that (a) Davis has

failed to properly develop the argument; and (b) alternatively, that there is nothing to

suggest that the ALJ failed to consider this laundry list of additional non-severe impairments.

Although the ALJ explicitly noted that he was considering the following non-severe

impairments - gastroesophageal reflux disease, grade I spondylolisthesis of L3 on L4, and

headaches - he further noted that he was considering "all impairments regardless of

severity."  A.T. 30.  The ALJ was not required to list every single non-severe impairment that

United States District Court
For the Northern District of California

1  he had considered, and this statement demonstrates that the ALJ was aware of the

2  requirement that he consider both Davis' severe and non-severe impairments at step three

3  and with his RFC analysis.  Accordingly, to the extent Davis challenges the ALJ's treatment

4  of the above laundry list of impairments *at a step other than step five* in conjunction with her

5  arguments on this issue, this court affirms the ALJ's decision.

6      On remand, though, the ALJ's hypothetical questions posed to the VE at step five

7  must set out all the limitations and restrictions of the particular claimant.  See Embrey v.

8  Bowen, 849 F.2d 418, 422 (9th Cir. 1988).  Accordingly, to the extent that Davis possesses

9  limitations based on the above list, those should be presented to the VE on remand.  Id.

10                              **CONCLUSION**

11      For the foregoing reasons, the court GRANTS IN PART and DENIES IN PART Davis'

12  motion for summary judgment, and the court similarly GRANTS IN PART and DENIES IN

13  PART the Commissioner's motion.

14      Specifically, the court DENIES Davis' motion and affirms the Commissioner's

15  decision as to all issues with the exception of Davis' challenge to the ALJ's step five analysis

16  and conclusion.  As to that issue, the court concludes that the ALJ erred in relying on the

17  Grids and by failing to call a VE, and remands the case for further proceedings consistent

18  with the above directions pursuant to sentence four of 42 U.S.C. § 405(g).

19      This order fully adjudicates the motions listed at numbers twenty-seven and twenty-

20  eight of the clerk's docket for this case.  The clerk shall close the file.

21

22  **IT IS SO ORDERED.**

23

24  Dated: July 23, 2012

25                              _____

26                              PHYLLIS J. HAMILTON
                               United States District Judge

27

28